**UNITED STATES of America, Plaintiff,**

**v.**

**Marshall A. ZOLP, et al., Defendants.**

**Crim. A. No. 86–299.**

United States District Court,
D. New Jersey.

April 30, 1987.

Jonathan Feld, and Faith S. Hochberg, Asst. U.S. Attys., Office of the U.S. Atty., Newark, N.J., for plaintiff.

Michael Pedicini, West Orange, N.J., for defendant Barbara Baker.

Alvin E. Entin, Entin, Schwartz, Barbakoff & Schwartz, Miami, Fla., for defendant Morton Berger.

John R. Wing, Weil, Gotshal & Manges, New York City, for defendant Philip A. Bernick.

Paul J. Hirsh, Whipple, Ross & Hirsh, Newark, N.J., for defendant Robert D. Boose.

Joseph E. Govlick, Montclair, N.J., for defendant Vincent Daniel Castellano.

Gerald Bouchal, Newton, N.J., for defendant Lorenzo Formato.

Bradford Bury, Bury, Czarnicki & Manahan, Mountainside, N.J., for defendant George Livieratos.

Chester Keller, Federal Public Defender, Newark, N.J., for defendant Thomas Quinn.

Robert Eugene Smith, Woodland Hills, Cal., for defendant Marshall Zolp.

## OPINION

LECHNER, District Judge.

The Government charges many of the fourteen defendants in this action with engaging in a conspiracy and with carrying out fraudulent activities in connection with their dealings with a corporation, Laser Arms Corporation ("Laser Arms"), which at all relevant times is alleged to have had fictitious executives and no legitimate assets. More particularly, the Government charges certain of the defendants with conspiracy to defraud investors in Laser Arms, certain of the defendants with actually perpetrating the fraud and certain of the defendants with related unlawful actions. In addition, the Government charges some of the defendants with conspiracy to obstruct administration of justice, and some with a wire fraud violation. Some of the defendants in these last two charges are not formally charged with participating in the Laser Arms securities wrongdoings. Eight of the fourteen defendants named in the indictment have raised various pretrial motions. For the sake of convenience, I address all of these motions in a single opinion.

*Factual Allegations* [1]

The defendants relevant for purposes of these motions are as follows. Marshall Zolp, who has numerous aliases, appears to be the principal defendant in this action. At all times relevant he is alleged to have wholly owned the Equities Processing and Clearing Corporation ("EPC"), and to have maintained an account at the United Bank of Lea County, located in Hobbs, New Mexico.[2] Barbara Baker is alleged to have been an associate of Zolp who, in May, 1986, posed as an owner of EPC and opened an EPC account at the Reliance Savings & Loan Association ("Reliance S & L"), located in Rahway, New Jersey. Morton Berger is alleged to have been an attorney representing Laser Arms and Zolp at all relevant times. Phillip Avery Bernick is alleged to have been employed as a stock trader in December, 1985 at S.W. Devanney and Co., a stock brokerage firm located in Denver, Colorado. In May, 1986, Bernick became president of Allison Securities, another Denver stock brokerage firm.

---

1. Except as otherwise noted, the facts set forth herein are taken from the indictment.

2. A superseding indictment, filed April 9, 1987, indicates Zolp controlled the stock and corporate business of Laser Arms. (Superseding Indictment at p. 2.)

Robert Dean Boose is identified in the indictment simply as a stock broker. Vincent Castellano is alleged to have been an associate of Zolp who, with Baker, posed as an owner of EPC and the Reliance S & L account. George Livieratos is alleged to have been an associate of Zolp who, in May, 1986, promoted a fictitious product of Laser Arms at a press conference. Tommy Quinn is identified simply as having conducted business with another defendant under the name International Trade & Management ("ITM"), located at Route 206, Andover, New Jersey. The other defendants in the case are not participants in these motions.

The indictment charges that on December 26, 1985, Zolp and Bernick mailed an application to the National Quotations Bureau ("NQB"), a stock price quotation service for over-the-counter stocks, located in Jersey City, New Jersey. The Government charges that Zolp, Bernick and others, by submitting this application, intended "to deceive the NQB and regulatory agencies into permitting the sale of Laser Arms stock to the investing public when, in truth and in fact, said stock was neither registered nor exempt from registration as required by federal securities law." (Indictment at p. 6.) Zolp and others are alleged to have generated fictitious corporate documents, sold Laser Arms shares to stock brokerage houses when they knew Laser Arms had not been incorporated, and established brokerage accounts by which they secretly profited on trading Laser Arms stock. (*Id.* at pp. 6–7.)

In January and March, 1986, defendants are alleged to have fabricated "Reports to Shareholders" using photographs of unknown actors to depict the fictitious executives of Laser Arms. In February, 1986, Zolp and others allegedly issued a false press release stating Laser Arms had developed, and obtained a patent for, a self-cooling beverage can that would automatically chill its contents upon opening. On April 7, 1986, Zolp and others advertised this non-existent product in the Wall Street Journal. (*Id.* at p. 9.) Furthermore, on May 8, 1986, Zolp, Livieratos and others staged a press conference at the World Trade Center in New York to display a fraudulent prototype of the self-cooling can. (*Id.* at p. 7.) All of these activities allegedly were undertaken to promote the sale of Laser Arms' worthless stock to the investing public.

On April 21, 1986 the Securities and Exchange Commission ("SEC") suspended trading in Laser Arms stock for a ten day period. On April 30, 1986, the SEC obtained a court order from Judge Conner of the United States District Court for the Southern District of New York, freezing all of Zolp's and Laser Arms' assets. On May 16, 1986, Judge Conner entered a preliminary injunction continuing the freeze imposed upon the assets pending termination of the SEC's investigation. On June 23, 1986, Judge Conner extended the freeze order to include the $150,000.00 in the EPC account at the Reliance S & L. (Superseding Indictment at p. 4.)

On April 24, 1986, shortly after the SEC had suspended trading in Laser Arms stock, Zolp and another defendant allegedly caused others to open the EPC account at the Reliance S & L, by using "a fake signature of a fictitious person named 'Morris Wallace,' " on the signature card submitted with the application to open the account. (Indictment at p. 17.) On April 24, 29 and 30, 1986, Zolp and Bernick transferred $300,000.00, "the proceeds of the Laser Arms fraud," from accounts in Hobbs, New Mexico and Denver, Colorado to the EPC account at the Reliance S & L in Rahway, New Jersey. (Superseding Indictment at p. 13.) On May 1, 1986, the $300,-000.00 was withdrawn from the EPC account at the Reliance S & L, $50,000.00 in cash and $250,000.00 by bank check. (*Id.*) On May 8, 1986, Zolp and other defendants caused an additional $150,000.00 in cash to be deposited in the EPC account at the Reliance S & L. Also on May 8, 1986, at Zolp's instruction, Baker and Castellano portrayed themselves to Reliance S & L officials as independent new owners of EPC and the EPC account. (Indictment at p. 17.)

The record indicates Judge Debevoise, in an order signed on May 2, 1986, authorized

Government officials to conduct surveillance of the ITM telephones in Andover, New Jersey for a thirty-day period. Subsequent orders, signed by Judge Debevoise on May 31 and June 30, 1986, Judge Fisher on July 30, 1986, and Judge Cowen on August 29, 1986, authorized extensions on the initial ITM wiretap application. Furthermore, in an order signed August 11, 1986, Judge Debevoise authorized Government officials to conduct telephone surveillance of Baker's home residence for a thirty-day period. Also, in an order signed June 10, 1986, Judge Griesa, District Judge from the Southern District of New York, authorized Government officials to conduct telephone surveillance of a certain office located in downtown Manhattan for a thirty-day period.[3]

In a telephone conference call intercepted by the Government at the ITM offices on May 12, 1986, Zolp, Baker, Castellano, Berger and another defendant, Lorenzo Formato, allegedly agreed to create a false explanation and false documents to explain to the SEC the source of the $150,000.00 deposited in the EPC account at the Reliance S & L on May 8, 1986. (*Id.* at p. 18.) Baker, on June 5, 1986, and Quinn, on June 13, 1986, allegedly gave false information to an SEC employee inquiring about Zolp and the EPC account. This misinformation served to conceal Zolp's whereabouts, and his control over EPC and its assets. (*Id.* at pp. 18–20.)

The Government filed its indictment in this case on September 18, 1986. Count one charges Zolp, Bernick, Boose, Livieratos and six others with combining and conspiring "to use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of a security not registered on a national securities exchange," in violation of 17 C.F.R. § 240.10b–5 and 15 U.S.C. §§ 78j(b) and 78f(f). The count concludes the alleged actions violate the federal conspiracy statute, 18 U.S.C. § 371. Count two charges Zolp, Bernick, Boose, Livieratos and six others with using "manipulative and deceptive devices and contrivances ... in connection with the purchase and sale of a security not registered on a national securities exchange," contrary to 17 C.F.R. § 240.-10b–5. The count concludes the alleged actions violate 15 U.S.C. §§ 78j(b) and 78f(f) and 18 U.S.C. § 2.

Count three charges Zolp and Bernick with devising a scheme and artifice to defraud "by selling to the investing public worthless stock of an unincorporated company with no management and no product," and with initiating the scheme by filing the Laser Arms application with the NQB. The count charges mail fraud in violation of 18 U.S.C. §§ 1341 and 2. Count four charges Zolp and Bernick with transferring $300,000.00 from the bank accounts in Colorado and New Mexico to the EPC account at the Reliance S & L, thereby causing fraudulently obtained or stolen funds to be transported in interstate commerce. The count alleges violations of 18 U.S.C. §§ 2314 and 2.

Count five charges Zolp, Baker, Castellano, Berger, Quinn and one other defendant with conspiring and agreeing

> to corruptly endeavor to influence and impede a judge of the United States District Court (S.D.N.Y.) in the discharge of his duty to preside over the SEC civil proceedings, and to knowingly and wilfully corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede the due administration of justice, contrary to Title 18, United States Code, Section 1503.

(*Id.* at pp. 16–17.) This count asserts Zolp and these other defendants agreed to attempt to devise a plan for assisting Zolp in circumventing the freeze Judge Conner had imposed upon the assets of Zolp and Laser Arms, all in violation of 18 U.S.C. § 371. Finally, count six charges Zolp, Baker, Castellano, Berger and another defendant with devising a scheme to defraud investors out of the $150,000.00 remaining in the EPC account at the Reliance S & L. The count alleges that defendants' use of the interstate telephone system in devising this scheme constituted wire fraud in violation of 18 U.S.C. §§ 1343 and 2.

---

**3.** The government advised the court of the date Judge Griesa signed this order.

To support the charges contained in this indictment, the Government will rely in part on evidence secured via: (1) telephone surveillance of the ITM facility, located in Andover, New Jersey; (2) telephone surveillance of the Baker residence, located in Alpine, New Jersey; (3) telephone surveillance of offices subscribed to by the N.Y. Bagel Manufacturing Corporation, located at 130 William Street, New York, New York; (4) a search conducted at the Denton & Co. facility located at 5 Marine View Plaza, Hoboken, New Jersey; (5) a search of storage units 1112 and 1002 located at Keeper's Self Storage, 201 64th Street, Brooklyn, New York; (6) a search conducted at Zurich Depository Corp., located at 1165 Northern Boulevard, Manhasset, New York; (7) a search conducted at the aforementioned ITM facility; and (8) a search conducted at the aforementioned Baker residence. The sufficiency of the affidavits supporting the Government's applications for authorization to conduct these surveillances and searches will be discussed, *infra*, in light of defendants' specific challenges.

*Discussion*

Many of the defendants' motions raise common issues. Where necessary, I address particular points raised by individual defendants. Various defendants, through counsel, have orally requested, or have submitted letters requesting, they be permitted to join other defendants' motions. Some of the requests are somewhat unspecific. Without passing judgment on the procedural propriety or practical efficacy of such requests, this opinion will address all aspects of those requests.

### A. *Severance Motions*

Many of the defendants have moved, pursuant to Rule 12(b)(5) and Rule 14 of the Federal Rules of Criminal Procedure, that they be severed from the trial of the other defendants. In relevant part, Rule 14 provides: "If it appears that a defendant or the Government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." These defendants each claim his or her alleged involvement in the actions described in the indictment was non-existent or, at most, incidental to other actions alleged in the indictment. Each of these defendants claim that if forced to proceed in this trial, he or she will be irreparably prejudiced at trial by the Government's evidence against the other defendants. A review of controlling case law indicates that such motions for severance are not lightly granted.

As defendants must concede, the courts have displayed a marked preference for permitting joint trials in cases such as the one at bar, involving ongoing investigations with overlapping and intertwined actors and evidence. *See, e.g., United States v. Wright-Barker*, 784 F.2d 161, 175 (3d Cir. 1986); *United States v. DePeri*, 778 F.2d 963, 983 (3d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *United States v. Reicherter*, 647 F.2d 397, 399–400 (3d Cir.1981). Joint trials in such cases further the legitimate concern with fostering judicial economy. *See, e.g., Reicherter*, 647 F.2d at 400; *United States v. Thomas*, 610 F.2d 1166, 1170–71 (3d Cir.1979). In addition, joint trials in these types of cases "recogniz[e] the tactical disadvantage to the Government from disclosure of its case [in the event severance is granted]." *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir.), *cert. denied,* 454 U.S. 871, 102 S.Ct. 341, 70 L.Ed.2d 176 (1981).

To succeed on a Rule 14 motion for severance, a defendant must demonstrate he will be substantially prejudiced by having to participate in a joint trial at which evidence not incriminating as to him will be introduced to incriminate other defendants. *See United States v. DiPasquale*, 740 F.2d 1282, 1293–94 (3d Cir.1984), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985). A defendant may not simply suggest he will be prejudiced by a joint trial; nor is it sufficient for him to point out the Government's evidence

against him is weaker than it is against one or more of his co-defendants. *See, e.g., DePeri,* 778 F.2d at 984; *United States v. Dansker,* 537 F.2d 40, 62 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Rather, the defendant must demonstrate that in light of the evidence to be submitted against him, the evidence in the case as a whole is so complex or confusing, that a reasonable jury would be unable to "compartmentalize" the evidence as to each defendant and would thus be unable to make an individualized determination of the prejudiced defendant's innocence or guilt. *See, e.g., United States v. Bright,* 630 F.2d 804, 813 (5th Cir.1980); *United States v. DeLarosa,* 450 F.2d 1057, 1065 (3d Cir.1971), *cert. denied,* 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972). Discretion over such motions rests with the district court. *See United States v. Boyd,* 595 F.2d 120, 125 (3d Cir.1978).

■ The charges contained in the indictment allege various specific instances of unlawful activity. Certain of the defendants are charged with conspiring to use deceptive means in connection with the purchase and sale of Laser Arms stock. The same defendants are charged with actually using deceptive means in connection with the purchase and sale of Laser Arms stock. Bernick and Zolp are charged with submitting a fraudulent Laser Arms application to the NQB and with causing to be transported in interstate commerce stolen or fraudulently obtained money. Certain other defendants are charged with conspiring to obstruct justice once the SEC's civil investigation into Laser Arms had commenced in April, 1986 in the Southern District of New York. Finally, certain of the defendants are charged with devising a scheme during a telephone conference call, conducted on May 12, 1986, to defraud investors in Laser Arms out of certain funds. That the various defendants are charged with unlawful acts which took place during distinct time periods supports the Government's assertion the jury will be able to compartmentalize the evidence presented at trial. *See United States v. Sebetich,* 776 F.2d 412, 427 (3d Cir.1985).

Having carefully reviewed the indictment and the arguments raised by defendants, I see no basis for finding that a jury, given appropriate instructions from the court, would be unable to "compartmentalize" the evidence with respect to each defendant on each charge to arrive at individualized determinations of guilt or innocence. Livieratos is named only in the first two counts. I see no reasonable basis for believing a jury would be unable to keep his alleged involvement in the scheme limited to the events and circumstances set forth in those two counts. Similarly, Bernick is named in each of the first four counts of the indictment and need not fear implication in the subsequently occurring events giving rise to the fifth and sixth counts. Conversely, Baker, Castellano and Berger are named only in the fifth and sixth counts and thus a jury, properly instructed, will readily be able to keep its focus on them limited to the events described in those counts.

■ Boose is charged only in the first two counts with participating as a stock broker in the conspiracy to use, and the use of, deceptive means in connection with the purchase and sale of Laser Arms stock. A jury will readily be able to keep its focus on his involvement in the case limited to those charges. Finally, Quinn is named only as a participant in the conspiracy to obstruct justice count, apparently in connection with his giving false information to an SEC official. Although his participation in the overall scheme of the case does not appear in the indictment to be extensive, I do not believe a jury would be unable to keep his limited participation in mind when deliberating his guilt or innocence on the conspiracy to obstruct justice charge. Quinn's speculation that he may be prejudiced by not being able to call a co-defendant, Lorenzo Formato, as an exculpatory witness, provides no basis for granting his request to be severed from this trial. Quinn has made no showing Formato might testify on Quinn's behalf or that such testimony might prove exculpatory. *See United States v. Dickens,* 695 F.2d 765, 779 n. 19 (3d Cir.1982), *cert. denied,* 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983); *see also United States v. Gorecki,* 813 F.2d 40,

42–43 (3d Cir.1987) ("bare allegation [of prejudice] without a specific showing as to what that testimony may have been, fails to meet the stringent requirements for a Rule 14 showing of prejudice").

This case does not present a situation such as existed in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). In that case the Government obtained convictions of several of thirty-two defendants named in an indictment which alleged a single general conspiracy. The Government admitted, however, its evidence at trial proved "some eight or more different" conspiracies, interconnected by one key individual. The Supreme Court overturned the appellate court's finding of harmless error in the convictions, noting that an erroneous jury charge and the complexity of the case, may well have confused the jury. The Court stated:

> We do not think that either Congress ... or this Court ... intended to authorize the Government to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all.

*Id.* at 773, 66 S.Ct. at 1252. The case at bar falls far short of the factual complexity of *Kotteakos*, and is not tainted by an imprecise indictment as existed in *Kotteakos*. Accordingly, the Rule 14 motions for severance are denied.

■ Counsel for Berger has also argued vigorously on behalf of his client for severance under Rule 8(b) of the Federal Rules of Criminal Procedure.[4] That Rule provides:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and

all of the defendants need not be charged in each count.

Berger urges counts five and six, the only counts in which he is named as a defendant, charge offenses distinct from those charged in counts one through four. Berger further asserts the offenses contained in counts five and six cannot fairly be said to comprise offenses part of a series of acts or transactions constituting an offense or offenses. Accordingly, in contrast to the Rule 14 motions for severance in which the trial court's discretion is involved, Berger argues severance under Rule 8 is mandated as a legal matter. The Government opposes this motion, asserting the allegations contained in counts five and six relate directly to the allegations contained in the prior counts. The Government asserts counts five and six, in which the defendants charged therein are alleged to have participated in efforts to conceal and obtain monies obtained from the underlying securities fraud, must be recognized as elements of one overall scheme.

I am satisfied the charges contained in counts five and six of this indictment are sufficiently related to those charged in counts one through four such that their joinder in a single indictment does not constitute misjoinder. While it is true that the offense of conspiracy to obstruct justice and the offense of wire fraud—in and of themselves—cannot be seen as equivalent to the alleged securities fraud offenses, I am persuaded in the case at bar the offenses are sufficiently related such that they may be considered as elements in a "series of acts or transactions constituting an offense" as required by Rule 8(b). Counts one through four address various aspects of the unlawful taking of monies generated by means of a stock fraud scheme. Counts five and six encompass the intimately related and ultimately inevitable actions taken to conceal and dispose of the fraudulently obtained money. To find that the charges contained in counts five and six are not part of a series of events initially involving the actions

---

**4.** Counsel for Baker and Castellano have orally moved to join in this Rule 8(b) severance mo- tion. (Transcript, 3/25/87 at 37.)

charged in counts one through four, would restrict the meaning and intent behind Rule 8(b) to an unreasonable degree.

Other courts have ruled similarly in analogous contexts. *See, e.g., United States v. Johnson*, 763 F.2d 773, 775–76 (6th Cir.), *cert. denied,* —— U.S. ——, 106 U.S. 178, 88 L.Ed.2d 148 (in multi-defendant case involving transportation of stolen vehicles, no Rule 8(b) misjoinder where one defendant was charged only with one count of mail fraud because "the mail fraud was logically interrelated with the other acts charged in the indictment"); *United States v. Perry*, 731 F.2d 985, 989–92 (D.C.Cir. 1984) (no Rule 8(b) misjoinder where only one of two defendants in drug dealing case was charged in one of the counts of the indictment because of the "logical relationship between the acts or transactions within the series"); *United States v. Carmichael*, 685 F.2d 903, 909–10 (4th Cir.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983) (co-defendants charged with election fraud and subsequent obstruction of justice charges properly joined in indictment because " 'transaction' is a flexible term implying a connection of logical relationship rather than immediateness"); *United States v. Ford*, 632 F.2d 1354, 1371–73 (9th Cir.1980), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981) (where two counts of fifteen count indictment charging trustees with pension fund fraud alleged conduct distinct from previous counts, defendants were properly joined because of logical relationship "shown by existence of a common scheme, plan or conspiracy" even though the plan, scheme or conspiracy was not charged on face of indictment); *United States v. Rogers*, 636 F.Supp. 237, 242–44 (D.Colo.1986) (no Rule 8(b) misjoinder in indictment charging various defendants with mail, tax and securities fraud and with obstruction of justice because "[t]he mail fraud offenses ... and the obstruction of justice charges ... are inextricably related to the common plan to defraud").

Contrary to Berger's arguments, *United States v. Bledsoe*, 674 F.2d 647 (8th Cir.), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982), does not compel severance. That case initially involved a single indictment variously charging twenty-two defendants with one or more violations of law as contained in 175 counts. One of the principal defendants, Phillips, was charged in two of the indictment's counts with two instances of securities fraud. Those charges were completely unrelated to any of the numerous other fraud charges contained in the indictment and did not involve any of the other defendants in the indictment. Noting that the two securities fraud counts "stand remarkably alone" and "singularly allege distinct acts involving only Phillips," *id.* at 656, the Eighth Circuit declared the other defendants had been improperly joined with Phillips and vacated their convictions. *Id.* at 657. In the case at bar, unlike in *Bledsoe*, the two counts under attack are intimately related to the prior counts charging securities fraud. Thus, *Bledsoe* does not compel a declaration of misjoinder in this case.

Finally, it bears mentioning that at oral argument the Government asserted even if Berger and the defendants named in counts five and six were severed from the case in chief, the Government would introduce at the subsequent trial evidence of the underlying Laser Arms securities fraud and Berger's prior representation of Zolp and Laser Arms, presumably to provide an explanation and context for the events charged as unlawful in counts five and six. (Transcript, 3/25/87 at 31, 35.) Because the allegedly prejudicial evidence would be introduced, even in a severed trial, the Government asserts the underlying justification for a Rule 8(b) severance is undermined. Certain other courts have favorably received this argument in denying Rule 8(b) severance motions. *See, e.g., Perry*, 731 F.2d at 991–92; *Carmichael*, 685 F.2d at 910. Although this point does not form the basis for my denial of the Rule 8(b) severance motion, it adds weight to an already sufficient case against severance.[5]

---

**5.** I take under advisement the government's suggestion that limiting instructions to the jury

In this case the various defendants are charged with specific and discrete, albeit interrelated, criminal acts. Because there is no basis for claiming the jury will be unable to compartmentalize the evidence, and because there is a sufficient showing of interrelated unlawful activity, the motions for severance are denied.

### B. *Discovery Motions*

#### 1. *General Discovery*

■ Representations made in the Government's brief and at oral argument indicate that the Government is fully aware of its obligations under the Jencks Act, 18 U.S.C. § 3500, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and governing case law to make discoverable material available to the defendants with sufficient time so the defendants will be able to prepare effectively for trial. As of this date, it appears the Government has provided the defendants with tapes of wiretapped calls and supporting and accompanying documentation, documentation relating to the executed search warrants, arrest reports and post-arrest statements. The Government has promised to disclose the defendants' criminal history records as they become available. The Government claims it has not obtained exculpatory evidence such as must be revealed under *Brady,* and pledges it will disclose such evidence if and when it surfaces. Furthermore, the Government has agreed to turn over Jencks Act material seven days prior to the commencement of trial and to retain any rough notes and drafts taken and prepared by investigating officers and agents.[6] Finally, the Government has pledged to make available materials bearing on the credibility of witnesses, as well as to give notice of its intention to introduce "prior crimes" evidence against

defendants, in time so that the defendants will be able to prepare their defenses.[7]

The Government's position on each of these points is reasonable under the Jencks Act and the *Brady* doctrine and is amply supported by the case law. *See, e.g., Palermo v. United States,* 360 U.S. 343, 350, 79 S.Ct. 1217, 1223, 3 L.Ed.2d 1287 (1959) ("One of the most important motive forces behind the enactment of this legislation was the fear that an expansive reading of *Jencks* would compel the undiscriminating production of agent's summaries of interviews regardless of their character or completeness.") *United States v. Higgs,* 713 F.2d 39, 44 (3d Cir.1983), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984) (evidence going to credibility of Government's witness may be disclosed on day witness testifies); *United States v. Murphy,* 569 F.2d 771, 773 (3d Cir.), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978) (Jencks Act material need not be disclosed until witness testifies at trial); *United States v. Miller,* 520 F.2d 1208, 1211 (9th Cir.1975) (Government need not disclose prior to opening statement evidence of defendant having committed prior similar criminal acts). To the extent defendants seek disclosure of these types of material well in advance of the time the Government has offered to make the evidence available, the motions are denied.

■ Certain of the defendants seek a list of the Government's actual or potential trial witnesses. The Third Circuit does not require that the Government divulge its trial witnesses and defendants herein have presented no compelling justification for departing from this settled principle. *See DiPasquale,* 740 F.2d at 1294; *United States v. Mitchell,* 540 F.2d 1163, 1166 (3d Cir.1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1119, 51 L.Ed.2d 547 (1977); *United States v. Zirpolo,* 288 F.Supp. 993, 1019

might be called for during trial. I shall rely on counsel so concerned to make appropriate application, prior to trial, for such instructions.

**6.** To the extent defendants request the government to turn over rough notes and drafts of investigating officials, except as required by controlling law, those requests are denied.

**7.** The government has agreed to make available to the court any "prior crimes" evidence it intends to introduce at trial on or before two weeks prior to the trial date.

(D.N.J.1968), *rev'd on other grounds,* 450 F.2d 424 (3d Cir.1971). Accordingly, the motions for disclosure of trial witnesses are denied.

### 2. *Disclosure of Informant*

Certain defendants seek to have the Government disclose the identity of its confidential informant whose information was instrumental in aiding the Government in obtaining authorization for the wiretaps and search warrants in this case. Quinn points out that because the informant was evidently present in the ITM offices and in other locations at the same time as certain of the defendants, and may have been personally involved in the unlawful activities charged in the indictment, his testimony could prove beneficial to the defendants. Baker suggests an interview with the informant might provide grounds for asserting an entrapment defense or might cast some doubt on whether Baker knowingly participated in the activities charged in the indictment.

As described in *Roviaro v. United States,* 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957) (citations omitted):

... the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. ... The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

Whether a court should uphold the Government's assertion of the privilege in the face of a defense request for disclosure, requires a balancing of this public interest with the individual defendant's need for disclosure. The court must consider the circumstances of the case, including the crime charged, possible defenses, and the significance of the informant's likely testimony. *Id.* at 62, 77 S.Ct. at 628.

The defendant bears the burden of demonstrating his need to know the identity of a confidential Government informer. *See United States v. Jiles,* 658 F.2d 194, 197 (3d Cir.1981), *cert. denied,* 455 U.S. 923, 102 S.Ct. 1282, 71 L.Ed.2d 465 (1982); *United States v. Prueitt,* 540 F.2d 995, 1003–04 (9th Cir.1976), *cert. denied,* 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977). This "burden is not met by mere speculation that identification might possibly be of some assistance." *In re United States,* 565 F.2d 19, 23 (2d Cir.1977), *cert. denied,* 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978). The defendants seeking disclosure of the informant's identity in this action have done no more than speculate that because the Government's informant was evidently in close contact with some of the defendants, his identity and testimony may be of some assistance to their defense. Such speculation fails to warrant disclosure of the identity of the informant in this case.

The facts in this case are distinct from those existing in *Roviaro,* in which a single defendant was convicted of a single instance of selling and transporting heroin. In that case, the informant "had taken a material part in bringing about the possession of certain drugs by the accused, had been present with the accused at the occurrence of the alleged crime, and might be a material witness as to whether the accused knowingly transported the drugs as charged." *Roviaro,* 353 U.S. at 55, 77 S.Ct. at 625. In that case, the informant was directly and intimately involved in the single instance of criminal activity with which the single defendant was charged. Accordingly, the Supreme Court decided disclosure was warranted.

In the case at bar, by contrast, there is nothing in the record to suggest the Government's informant played so key and pivotal a role in the wrongful conduct alleged in the indictment. Thus, the informant is unlikely to provide the type of evidence that might support an entrapment defense. *See Roviaro,* 353 U.S. at 64, 77 S.Ct. at 629. Nor is it suggested the informant in this case is somehow instrumental

to the Government for purposes of identifying the defendants. *See, Roviaro,* 353 U.S. at 64, 77 S.Ct. at 629; *United States v. Ordonez,* 737 F.2d 793, 807–09 (9th Cir. 1983). Accordingly, the defendants have failed to carry the burden of demonstrating a specific need to know the informant's identity and the motion is denied.

### 3. *Bill of Particulars*

 As explained by the Third Circuit, a bill of particulars is designed "to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense." *United States v. Addonizio,* 451 F.2d 49, 63–4 (3d Cir.1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972), *quoting United States v. Tucker,* 262 F.Supp. 305, 308 (S.D.N.Y. 1966). A request for a bill of particulars should be granted when, in the discretion of the trial court, it appears the indictment is too vague to fairly inform the defendant of the nature of the charges against him. *See Addonizio,* 451 F.2d at 64, *quoting, United States v. Haskins,* 345 F.2d 111, 114 (6th Cir.1965). In recognition of the Government's interest in not being forced to divulge the entirety of its case prior to trial, a court need not grant a request for a bill of particulars where it would serve to provide the defendant with "a detailed disclosure of the Government's evidence prior to trial." *United States v. Kilrain,* 566 F.2d 979, 985 (5th Cir.), *cert. denied,* 439 U.S. 819, 99 S.Ct. 80, 58 L.Ed.2d 109 (1978), *quoting United States v. Perez,* 489 F.2d 51, 70–71 (5th Cir.1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). *See also Addonizio,* 451 F.2d at 64.

 In this case Baker and Castellano seek a bill of particulars on the ground the charges contained in the indictment against them are vague and unspecific. I cannot accept this characterization of the indictment as it pertains to them. In count five Baker and Castellano, together with certain other specified defendants, are alleged to have participated in designing a scheme to falsely explain ownership of the funds contained in the EPC account in the Reliance S & L. In count six, they and certain other defendants are alleged to have participated in a telephone conference call in which plans were discussed for defrauding Laser Arms stockholders out of funds in the EPC account. As I read the allegations against Baker and Castellano, they are not so vague as to warrant a bill of particulars.

Bernick and Livieratos also claim to be unable effectively to prepare their defenses due to the vague nature of the indictment's allegations against them. Bernick seeks a bill of particulars setting forth numerous details of the government's case, including the names and addresses of co-conspirators and others referred to in the indictment, the nature of the manipulations, devices, frauds and representations referred to in the indictment and whether the indictment's various counts charge Bernick as a principal or an aider or abettor in the alleged unlawful activities. Livieratos seeks a similarly specific bill of particulars containing extensive details about the conspiracies and conspirators in which and with whom Livieratos is charged with participating.

 I do not read the indictment's charges against Bernick and Livieratos to be impermissibly vague. Count one charges Bernick with participation in a conspiracy to manipulate Laser Arms stock generally, and specifically with filing with the NQB a false Laser Arms application to trade stock to the public. Counts two and three charge Bernick with participating in Laser Arms stock manipulation and mail fraud, arising out of the charges contained in count one. Count four charges Bernick and Zolp with the interstate transfer of $300,000.00. Similarly, count one charges Livieratos with participation in the conspiracy to manipulate Laser Arms stock generally, and specifically with participating in the press conference demonstration of the fake "self-chilling" can. Count two charges Livieratos with participating in the stock manipulation scheme itself. Having reviewed the indictment, I cannot say it fails to inform Bernick and Livieratos of

"the nature of the charges brought against" them. *Addonizio*, 451 F.2d at 63.

Numerous courts have ruled that detailed discovery requests, such as those made by Bernick and Livieratos through their requests for a bill of particulars, need not be granted. As stated by the Third Circuit: "Appellant's request for the 'when where and how' of any overt acts not alleged in the indictment was tantamount to a request for 'wholesale discovery of the Government's evidence,' which is not the purpose of a bill of particulars under Fed. R.Crim.P. 7(f)." *United States v. Armocida*, 515 F.2d 49, 54 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975), *citing Addonizio*, 451 F.2d at 64. Similar requests for specific facts about an alleged conspiracy sought by way of a demand for a bill of particulars were denied in *United States v. Wilson*, 565 F.Supp. 1416, 1438–39 (S.D.N.Y.1983). *See also United States v. Boffa*, 513 F.Supp. 444, 485 (D.Del.1980), *aff'd in part, rev'd in part on other grounds*, 688 F.2d 919 (3d Cir.1982) ("nor is it necessary for the Government to disclose in a bill of particulars the precise details that a defendant and his alleged co-conspirators played in forming and executing a conspiracy or all the overt acts the Government will prove in establishing the conspiracy"); *United States v. Heldon*, 479 F.Supp. 316, 323 (E.D.Pa.1979).[8]

The allegations set forth in the indictment amply apprise defendants of the nature of the charges being brought by the Government. The requests for bills of particulars being unwarranted, the requests are denied.

### 4. *Grand Jury Records*

Quinn seeks access to grand jury records on the ground that because the grand jury returned a "patently defective" indictment against Quinn (Quinn's Brief at 17), he needs the material which was before the grand jury to effectively prepare his de-fense. Because this request appears to be be largely dependent on Quinn's claim that count five of the indictment should be dismissed as to him, I first address his motion to dismiss count five. Count five charges Quinn and five other defendants with conspiring to obstruct or impede justice.

Quinn argues count five of the indictment should be dismissed as against him because it fails to specify his involvement in the alleged conspiracy, fails to set forth that a judicial proceeding was pending at the time Quinn is alleged to have given false information to an SEC official, and fails to allege he knew of any pending judicial proceeding at the time he is alleged to have given the false information. Given these deficiencies, Quinn argues the indictment should be dismissed as against him. According to the Supreme Court, "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquital or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974) (citations omitted).

The fifth count of the indictment, while not crystal clear with respect to the details of the conspiracy charge therein, does contain the elements of the conspiracy alleged and amply informs Quinn of the charge against which he must defend. Specifically, the count asserts Quinn and five others "did knowingly and wilfully combine, conspire, confederate and agree among themselves and with others to corruptly endeavor to influence and impede a judge of the United States District Court (S.D.N.Y.) in the discharge of his duty to preside over the SEC civil proceedings...." (Indictment at p. 16.) Moreover, the count specifies the conspiracy began "on or about April 30, 1986" and con-

---

**8.** Bernick has cited to a number of cases in which motions for a bill of particulars similar to that which he seeks herein were granted. Having reviewed those cases, I am unconvinced they mandate a bill of particulars in the case at bar. In this case, apparently unlike the cases cited, the indictment is fairly fact specific and provides defendants ample ground for understanding the nature of the case against them. The law requires no more.

tinues to the present. (*Id.*) Thus, the indictment clearly charges Quinn participated in a conspiracy to obstruct and interfere with a judicial proceeding (the SEC proceeding pending before Judge Conner) which was ongoing at the time Quinn is alleged to have given false information to the SEC.

That the indictment fails to particularize the facts surrounding Quinn's involvement in the alleged conspiracy does not mandate dismissal of the indictment. As noted in *United States v. Perkins,* 748 F.2d 1519, 1525 (11th Cir.1984) (citations omitted): "Abundant case law supports the proposition that it is not necessary to allege in the conspiracy count all of the elements of the offense that is the object of the conspiracy with the same technical precision as would be necessary in a substantive count." *See also United States v. Shoup,* 608 F.2d 950, 960–61 (3d Cir.1979).[9] In the case at bar, the specifics of Quinn's involvement in count five's alleged conspiracy are presumably facts which the Government presented to the grand jury so as to obtain this indictment, and are facts which will be presented to the petit jury at trial. Because the indictment fairly apprises Quinn of the nature of the charges against him, his motion to dismiss count five of the indictment as against him is denied.

Because the indictment with respect to Quinn is not "patently defective," the basis of his request for access to grand jury material in this matter is undermined. Quinn's request for disclosure of grand jury material depends "upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." Fed.R. Crim.P. 6(e)(3)(C)(ii). (Quinn's Brief at 17.) Because Quinn has failed to demonstrate grounds may exist to support his motion to dismiss the indictment, the presumption against revealing the substance of grand jury proceedings warrants denial of defendant's request for those materials. *See Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 399–400, 79 S.Ct. 1237, 1240–41, 3 L.Ed.2d 1323 (1959); *United ed States v. Budzanoski,* 462 F.2d 443, 454 (3d Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972).

### C. *Hearing on Admissibility of Co-Conspirator Statements*

■ It appears the Government will rely, at least to some extent, on statements made by co-conspirators in furtherance of the conspiracies charged in the indictment, as evidence against other co-conspirators. Federal Rule of Evidence 801(d)(2)(E) provides: "A statement is not hearsay if . . . [it] is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." The preferred order of proof in cases involving co-conspirator statements is for the Government to prove by independent competent evidence the existence of a conspiracy and a party's involvement in the conspiracy, before admitting a co-conspirator's statement implicating the party. *See United States v. Continental Group, Inc.,* 603 F.2d 444, 456–57 (3d Cir. 1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980); *United States v. James,* 590 F.2d 575, 582 (5th Cir.), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

In some cases, however, because of their complexity or for other reasons, it may be inconvenient or impossible for the Government to prove the existence of the conspiracy, and each of the alleged co-conspirators' participation therein, by independent evidence before seeking admission of a co-conspirator's statement. In such cases, the courts have developed a practical evidentiary rule whereby a co-conspirator's statement is conditionally admitted into evidence, subject to the Government's obligation to prove the conspiracy's existence

---

**9.** Quinn's citation to *United States v. Washington Water Power Co.,* 793 F.2d 1079 (9th Cir. 1986), is unavailing. That case involved postconviction appeals that the evidence presented at trial failed to support the convictions. The issue of the sufficiency of the indictment was simply not before the Ninth Circuit. In addition, I do not read the case as Quinn's counsel urged at oral argument, to require in an obstruction of justice charge, that a *criminal* proceeding be pending.

and each conspirator's participation therein, by independent evidence submitted before the close of the Government's case. *See DePeri,* 778 F.2d at 981; *Continental Group,* 603 F.2d at 456; *James,* 590 F.2d at 581–83.

The danger inherent in such a rule lies in its potential for prejudicing a defendant in the eyes of the jury before the defendant is independently proven to be involved in 'the conspiracy. In the event the Government fails sufficiently to connect the defendant to the conspiracy, the "connection up" rule of admitting co-conspirator statements can lead to a declaration of a mistrial and the burden of retrying the case for the mistried defendant.

Many of the defendants have pointed to the potentiality of such a mistrial in this case, in support of their motions for a pretrial hearing to determine the existence of independent evidence of a conspiracy and each defendant's connection to it. Defendants urge such a pretrial hearing would not be unduly burdensome on the court or the parties, would effectively eliminate the possibility of prejudicing individual defendants at trial, and would permit the trial itself to run more smoothly without interruption for objections and rulings on the admissibility questions these statements are anticipated to generate. Of course, questions as to the order of proof and control over the admission of evidence lie in the discretion of the trial court. *See, e.g., United States v. Ammar,* 714 F.2d 238, 246 (3d Cir.), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983).

 For several reasons, I decline to grant defendant's request for a pretrial hearing on this issue. For example, in this complex case with numerous defendants such a hearing would require, in practical terms, a protracted "mini-trial" within the trial. *See Ammar,* 714 F.2d at 247. Moreover, such a pretrial hearing would require the Government to divulge the bulk of its case in advance of trial. The defendants have not advanced any persuasive reason or circumstances why this case, more than any of the aforementioned Third Circuit cases, merits such a pretrial hearing. The

Government is aware the preferred order of proof in this case will require the independent establishment of a conspiracy and a defendant's connection to it before a co-conspirator's statement will be admitted against the defendant. In the event a co-conspirator's statement is conditionally accepted into evidence, the Government is aware of its "connection" burden and the consequences of failing to carry the burden. Accordingly, the motions for a pretrial hearing on the admissibility of co-conspiratorial testimony are denied.

### D. *Challenges to Wiretaps*

To prove its case, it appears the Government may rely on secret tape recordings of telephone conversations occurring at the ITM office, the Baker residence in Alpine, New Jersey and the N.Y. Bagel Manufacturing Corporation office located at 130 William Street in Manhattan. Certain defendants have challenged the applications for those wiretaps as improperly authorized by the United States Department of Justice and the affidavits in support of those applications as plainly insufficient and unsupported by probable cause. Other defendants challenge the affidavits in support of the wiretap applications because the affidavits omit certain information and contain other information which may have influenced the judges to whom the applications were made. Because I find these challenges to be without merit, the motions to suppress the wiretaps are denied.

 Bernick's former counsel asserted: "I have no information or knowledge that the interceptions of telephone numbers [at issue in the case] were qualified authorizations under provision of 18 U.S.C. § 2516(1)." (Ruddy Aff., Ex. A, 12/30/86, ¶ 2.) 18 U.S.C. § 2516(1) provides: "The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application [for a wiretap]...." The Government has submitted documentation to show the applications at issue in this case were properly authorized by the Assistant Attorneys General of the Criminal

and Tax Divisions of the Justice Department. (*See* Government Ex. 9.) These authorizations are presumed to be valid and defendants carry the burden of demonstrating the authorizations are invalid. *See United States v. Jabara*, 618 F.2d 1319, 1326–27 (9th Cir.1980). Because no defendant has made a showing the authorizations in this case were improperly obtained, the wiretaps will not be suppressed on this ground.

Certain defendants argue the affidavits submitted by the Government in support of its applications for the wiretaps at issue in this case are facially insufficient because they fail to allege that normal, less intrusive investigative techniques had been tried and failed, or were likely to prove too dangerous to be attempted. 18 U.S.C. § 2518(3)(c) provides a judge may issue an order authorizing a wiretap "if the judge determines on the basis of the facts submitted by the applicant that ... normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." The cases make clear that the Government's burden on this score is not great. *See United States v. Adams*, 759 F.2d 1099, 1114 (3d Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985) ("the Government need not exhaust all possible traditional investigative techniques prior to applying for the wiretap"); *United States v. Vento*, 533 F.2d 838, 849 (3d Cir.1976) (footnote and citation omitted) ("the Government's showing [under 18 U.S.C. § 2518(3)(c) ] is to be 'tested in a practical and commonsense fashion'"); *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975) ("the Government need not prove to a certainty that normal investigative techniques will not succeed, but rather need only show that such techniques 'reasonably appear to be unlikely to succeed if tried' ").

■ A review of the affidavits in support of the wiretap applications in this case indicate the Government adequately demonstrated normal investigative techniques were proven insufficient and would not likely succeed in advancing the investigation. Special Agent Cahill of the Federal Bureau of Investigation submitted the affidavits at issue. Cahill, who appears to have had extensive experience in such investigations, claimed, *inter alia:* participants in securities fraud schemes conduct much of the unlawful side of their business over the telephone; such participants are aware the paper documentation involved in their business is subject to being subpoenaed and they thus often prepare such documentation so as to conceal wrongdoing; the confidential informant's knowledge of, and anticipated testimony on, the conspiracy would be insufficient to bring about convictions of all participants in the conspiracy; surveillance and searches of the premises would be insufficient to reveal the full extent of the conspiracy; and, because many of the suspects were aware of the pending SEC investigation into Laser Arms, they were particularly cautious about infiltration and "normal" governmental surveillance. (Government Exs. 2 at ¶¶ 39–49, 7 at ¶¶ 35–44, 8 at ¶¶ 50–59.)

Zolp has asserted Cahill's affidavits failed to set forth details of the SEC civil proceeding against Laser Arms and thus failed to advise the judge to whom the initial wiretap application was directed that normal investigative surveillance techniques had already proven effective in the investigation. Zolp suggests the judges to whom the applications were made might not have authorized the wiretaps had they been made aware of the success which "normal" investigative techniques had already achieved. Zolp's position is unpersuasive. First, Cahill's affidavit does allege that, based on the confidential informant's information, the SEC had suspended trading in Laser Arms stock. (Government Ex. 2 at ¶ 17.) Thus, the judges to whom the wiretap applications were made were aware that non-wiretap techniques had produced information against Laser Arms at least sufficient to suspend trading in Laser Arms stock. Moreover, the Cahill affidavit is explicit that "normal" techniques were unlikely "to determine the complete scope of the RICO conspiracy and related predicate offenses in which Sus-

pects are involved, and to identify the other participants and the roles played by such other participants." (*Id.* at ¶ 39.) [10]

Accordingly, I find the Government's affidavits in support of its wiretap applications amply demonstrate that "normal" investigative techniques appeared unlikely to succeed in obtaining sufficient evidence of the full extent of conspiracy. The motions to suppress the wiretaps on this ground, therefore, are denied.

Certain defendants further argue the affidavits submitted in support of the Government's application for these wiretaps failed to provide the courts to which the applications were made with sufficient indicia of probable cause to support the resulting court orders permitting the wiretaps. According to 18 U.S.C. § 2518(3)(a), (b) and (d), the affidavits submitted in support of a wiretap application must convince the judge to whom the application is made that

> there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense ...; there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; ... there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

The Supreme Court has stated, however, that these requirements "must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion.... [W]here [the underlying circumstances set forth in an affidavit] are detailed, where reason for crediting the source of the infor-

mation is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965).[11]

A review of each of the affidavits in support of the wiretap applications at issue indicates that ample probable cause existed for the judge to whom the application was made to issue the order authorizing the wiretap. The initial ITM wiretap application is supported largely by information supplied by an informant who, during a twelve month period, had "proven to be accurate and reliable in twenty-five (25) instances concerning cases involving burglary, theft, the unlawful disposition of stolen goods, narcotics, and firearms." (Government Ex. 2 at ¶ 7.) Moreover, the informant's information on this case had been corroborated by the affiant through interviews with one of the suspects in the investigation. (*Id.*) The twenty-three page affidavit is detailed, fact-specific and cannot be said to be lacking the requisite probable cause.

The affidavit in support of the application for a wiretap at Baker's residence is supported largely by information obtained from the authorized ITM wiretaps. The intercepted information from the ITM wiretaps suggested related unlawful business activity was being conducted at, and over the telephone at, Baker's home. (Government Ex. 7 at ¶¶ 10–34.) Accordingly, the Baker residence wiretap application is amply supported by probable cause. Finally, the same is true of the N.Y. Bagel Manufacturing Corp. wiretap application. Interceptions of calls made to or from the ITM facility indicated to investigators that aspects of the unlawful business would be conducted over telephone

---

**10.** Although the Cahill affidavit refers to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), there are no RICO allegations contained in the indictment.

**11.** Although *Ventresca* arose in the context of a challenge to the probable cause supporting is-

suance of a search warrant, the Third Circuit has recognized the probable cause requirements in search warrant and wiretap applications as identical. *See United States v. Falcone*, 505 F.2d 478, 481 (3d Cir.1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975).

from the N.Y. Bagel offices at 130 William Street in New York City. (Government Ex. 8 at ¶¶ 8–49.)

The Supreme Court has recently reaffirmed the commonsense *Ventresca* approach to probable cause questions:

> The task of the [court to which an application is made] is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (citation omitted). In light of this standard of review over probable cause challenges, and having reviewed the affidavits at issue in this case, I find the three wiretap orders challenged by these motions were amply supported by the requisite probable cause.

■■■ Finally, Zolp and Baker have suggested the Cahill affidavit submitted in support of the initial wiretap application is improper in that it suggests the individuals then under investigation were suspected of participating in gun trafficking, conspiracy to commit murder and gambling operations. These defendants assert there was no probable cause basis for these assertions and that these allegations improperly influenced the judge to whom the application was made to authorize the wiretap sought. The defendants urge because these charges of violence and gambling operations were not substantiated by conversations intercepted pursuant to the first wiretap order, and because subsequent affidavits seeking extensions of the initial wiretap order failed to mention that discussions pertaining to murder, gun trafficking, gambling and the like had not been intercepted, the initial wiretap order and the extensions thereto were improperly obtained. Zolp and Baker assert the wiretaps should be declared invalid and all evidence obtained thereby suppressed.

As a preliminary matter, I do not believe the initial Government affidavit lacked information to support a probable cause belief that the suspects under investigation were involved in unlawful activity beyond securities frauds. Information supplied by the Government's confidential and reliable informant, as well as evidence supplied by one of the defendants who was cooperating with the investigation, clearly indicated such activity had occurred and was occurring. (*Id.* at ¶¶ 23–35.) Moreover, although it is true the subsequent affidavits submitted by Cahill do not indicate any of the intercepted conversations concerned violent activity or gambling operations, I am unpersuaded the judges to whom the applications for the wiretaps were made were so prejudiced by the initial affidavit's allegations of gun trafficking, gambling and conspiracy to commit murder, such that the wiretap extension orders should be overturned.

Although the initial affidavit does suggest the targets of the investigation are suspected of other types of unlawful activities, the initial and primary focus of the affidavit is on the alleged securities frauds. (*Id.* at ¶¶ 9–22.) Furthermore, the affidavits in support of the extensions to the initial wiretap application allege, almost exclusively, wrongdoings connected to securities manipulations and related frauds. (Government Ex. 3 at ¶¶ 10–61; Ex. 4 at ¶¶ 10–48; Ex. 5 at ¶¶ 10–56; Ex. 6 at ¶¶ 10–71.) Because these affidavits concern, almost exclusively, alleged stock manipulation and related frauds, I do not believe the judges who issued the various orders authorizing the wiretaps at issue in this case were misled into allowing the wiretaps.

To prevail in this attack on the affidavit's supporting the Government's applications for these wiretaps, defendants have a difficult task. As stated by the Supreme Court,

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate false-

hood or a reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.

*Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). Defendants have failed to demonstrate the challenged affidavits contain falsehoods or are in reckless disregard for the truth. The motions to suppress the evidence obtained via the wiretaps utilized during this investigation, therefore, are denied.

E. *Challenges to Search Warrants*

Certain defendants have challenged the sufficiency of the affidavits submitted in support of the Government's applications for warrants to search the premises of: Denton and Co., 5 Marine View Plaza, Hoboken, New Jersey; Keeper's Self-Storage Center, Storage Units 1112 and 1002, 201 64th Street, Brooklyn, New York; Zurich Depository Corp., 1165 Northern Blvd., Manhasset, New York; ITM, Route 206, Andover, New Jersey; and Baker's residence at 24 Glen Goin, Alpine, New Jersey. I have reviewed those affidavits in light of the Supreme Court standards enunciated above and, because I find the affidavits all provide sufficient probable cause to support the issuance of the warrants authorizing those searches, I do not address the Government's contention that those defendants asserting a challenge to the search warrants lack the requisite standing. In addition, I find the affidavits sufficiently particularize the items to be searched for and seized such that they are not impermissibly overbroad.

 With respect to the search requested for the ITM offices, the affidavit supporting the application indicates that based upon information provided from extensive ITM wiretap interceptions, the Government had reason to believe a search of the premises would yield documentation and computer information on the unlawful business activities carried on there, as well as names, phone numbers and addresses of other participants in the ongoing scheme. (Government Ex. 13, Search Warrant and Affidavit at pp. 29–30.) With respect to the search warrant for the Denton and Co. office in Hoboken, the Government's confidential informant (already established as reliable) had provided information that certain aspects of the unlawful scheme had been discussed and carried out at the Denton and Co. office. Thus the affidavit submitted in support of the application concluded with the expectation that various records of unlawful stock transactions would be found during a search of the office. (Government Ex. 10, Search Warrant and Affidavit at pp. 34–35.)

 Similarly, with respect to the application for a warrant to search Baker's residence, a review of the affidavit indicates that between the information supplied by the Government's informant and information intercepted via telephone surveillance of the premises, there was ample cause to believe documentary evidence, records and other material generated during the ongoing scheme would be discovered at the Baker residence. (Government Ex. 14, Search Warrant and Affidavit at pp. 31–33.) As for the affidavit supporting the application for a warrant to search the Zurich Depository Corp., the affidavit establishes that between information supplied by the Government's reliable informant and telephone conversations intercepted from the Baker residence on September 5, 1986, cause existed to suspect that documents, cards and records relating to various aliases employed by various suspects in the investigation would be discovered. (Government Ex. 12, Search Warrant and Affidavit at pp. 29–31.)

 Finally, the affidavit supporting the application for a warrant to search storage units 1002 and 1112 located at Keeper's Self-Storage Center provides sufficient facts to support a finding of probable cause. Those units were rented to individuals fitting the Government's descriptions of certain suspects in the investigation. Moreover, the storage units were rented out to John Hand, Inc. and John Hand, aliases utilized by one of the suspects. Furthermore, the affidavit asserts that during a search of a New Jersey residence where Zolp had lived, an envelope with the address of Keeper's Self-Storage

was found. Based on these facts, and other intercepted telephone conversations in which suspects had discussed various kinds of documentation necessary to further the ongoing scheme, the special agent seeking the warrant asserted cause existed to believe the storage units would contain documentary evidence of the scheme. (Government Ex. 11, Search Warrant and Affidavit at pp. 8–11.)

The defendants have not challenged specific deficiencies in the subject search warrant affidavits. Rather, they have raised vague and conclusory objections. Based upon an independent review of the warrants in question, I cannot say they failed to present sufficient probable cause to support the resultant warrants. The motion to suppress evidence obtained during execution of these search warrants on this ground is denied.

### F. *Minimization Hearing*

One of the telephone conversations intercepted by the Government was a conference call conducted on May 12, 1986 among five of the defendants, one of whom was Berger. Several of the defendants, including Berger, have moved that this conversation be suppressed. The statutory basis for the request is contained in 18 U.S.C. § 2518(5), which provides: "Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable [and] shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter...."

Minimization of the wiretaps in this case was effectuated pursuant to the terms of a letter, dated April 28, 1986, signed by Faith S. Hochberg, Assistant United States Attorney, and addressed to "All Monitoring Agents and Special Deputy Marshalls" (the "Minimization Letter"). After explaining the need to minimize privileged calls generally, the Minimization Letter specifies:

You should be aware that Morton Berger, Esq. represents Lorenzo Formato [a defendant in this case] and has appeared in this Office with Formato and witnessed the execution of a plea agreement between Formato and the Government relating to entities known as Royer Securities and Worldwide Ventures, as well as tax evasion for the year 1981. Any conversations between Berger and Formato relating to Berger's legal representation of Formato are *not* to be intercepted. However, if there are telephone calls between Berger and anyone other than Formato, or between Berger, Formato and a third participant, and such calls pertain to offenses listed in Section 2516, these calls may be monitored provided that the content of the call does not indicate that Berger is an attorney representing such other person. Until you are further advised, do not monitor any conversations between Berger and Formato unless there is a third participant in such conversations, in which event they may be monitored if the conversations relate to Section 2516 offenses.

\* \* \* \* \* \*

If you have evidence that an attorney is involved in the criminal activity, contact me *before* you intercept his/her calls to discuss whether such calls should be intercepted. This caution is necessary because interception of attorney-client calls can easily jeopardize prosecutions or investigations not even remotely connected to this case.

In short, interception (monitoring and recording) should and must be discontinued whenever it appears that the call is personal, privileged, non-pertinent or otherwise not covered by the interception Order.

(Minimization Letter at p. 3 (emphasis in original).)

The Government claims that although Berger was known by monitoring agents to have been an attorney representing Formato, the conference call was properly intercepted because the call involved third persons not privy to the recognized attorney-client privilege between Berger and Formato and because the call was in furtherance of an offense enumerated in 18 U.S.C. § 2516, namely, conspiracy to obstruct justice, 18 U.S.C. § 1503. Defendants argue

because the Government knew or should have known Berger represented all of the participants in the conference call, the call should not have been intercepted. Furthermore, defendants argue the conference call was improperly intercepted by the monitoring agent because the agent could not have understood the call involved discussions about criminal conduct. Because the surveillance agents did not minimize the conference call, defendants urge the taped conversation must be suppressed.

The law protects communications between certain individuals from compelled disclosure because the overall value of promoting and protecting the relationships between such individuals is generally perceived by the law to be greater than the singular value of discovering any particular such communications. Communications between attorneys and their clients are protected from disclosure to foster the policy of promoting full and frank discussion between clients and their attorneys, thereby permitting litigants and their counsel to fully evaluate the merits of a particular case and thus enhancing the judicial system as a whole. One of the more oft-quoted passages on the privilege states:

> The [attorney-client] privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass. 1950).

The Government argues the privilege is improperly asserted in the conversation at issue because the conference call was made (1) in "the presence of strangers" and (2) "for the purpose of committing a crime or tort." Accordingly, the Government asserts its surveillance officers did not improperly fail to minimize the interception of the conversation. As a preliminary matter, the Government's burden to demonstrate the inapplicability of the attorney-client privilege in a situation such as this is not overwhelming. According to the Supreme Court, "there must be 'something to give colour to the charge [that the privilege is fraudulently or otherwise improperly sought];' there must be '*prima facie* evidence that [the charge of impropriety] has some foundation in fact.'" *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933), *quoting, O'Rourke v. Darbishire,* [1920] A.C. 581, 604.

 Having listened to the telephone call at issue and having heard the testimony of the agent who monitored the interception, I am satisfied the Government has met its burden on this point. The Government has made at the least a prima facie showing the conversation at issue was among five people, at least several of whom (Berger, Baker and Castellano) were not known to have been, and could not reasonably have been known to have been, involved in an attorney-client relationship. Thus, the Government has made at the least a prima facie showing this conference telephone call was not, and indeed could not have been expected by its monitoring agents to have been, privileged. *See, e.g., United States v. Gann,* 732 F.2d 714, 723 (9th Cir.), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 505, 83 L.Ed.2d 397 (1984) ("Because [appellant] knew, or should have known that third parties were present, his attorney-client privilege claim must fail.... [Appellant] cannot show that his conversation with his attorney was made in confidence."); *United States v. Blackburn,* 446 F.2d 1089, 1091 (5th Cir.1971), *cert. denied,* 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972) ("The communications between defendant and [his attorney] were not privileged, since third persons were present at the time the communications were made.").

Defendants point out that after some preliminary pleasantries, Berger initiated the substance of the conference call by remarking "I tell ya, I, I feel like I'm playing with a bunch of amateurs here, representing amateurs." Defendants strenuously contend that from this remark, the monitoring agent should have understood the ensuing discussion would involve confidential communications between Berger and his various clients, all parties to the conference call, and thus should not have been intercepted. At the evidentiary hearing on this motion, the agent who monitored the call in question clearly and succinctly explained her understanding at the time of the interception: "When Mr. Berger made that comment about the amateurs, I was led to believe that he was speaking about Mr. Formato and possibly Mr. Zolp, Laser Arms because there was no indication he was representing anyone else at that time." (Transcript, 3/31/87 at 60.) Having considered the evidence presented at the hearing and having listened to the tape in question, I am satisfied the Government has demonstrated that at the time of the interception it had no knowledge, and indeed had no reasonable basis for knowing, that Berger might be representing Baker and Castellano.[12] Thus, the monitoring agent had grounds to believe the call was not privileged and the call was properly intercepted.

Even if defendants had made a sufficient showing that at the time of the challenged interception the Government knew or should have known the call was protected by the attorney-client privilege, the Government has sufficiently demonstrated the monitoring agent reasonably believed the conference call was set up to initiate or further unlawful activity as spec-

ified in 18 U.S.C. § 2516. Referring to a conversation between Formato and Castellano which immediately preceded the conference call at issue, the monitoring agent testified: "Well, it appeared to me that [Castellano and Formato] were trying to fabricate a story to tell the SEC so that they could hide the true origination of the money, hide the fact that it was Laser Arms', Marshall Zolp money." (Transcript, 3/31/87 at 53.) Explaining her decision to intercept the subsequent conference call, the agent testified "based upon my knowledge of the case and the preceding phone call, it was obvious to me that the participants in the [conference] call were going to continue discussing how to fabricate a story for the SEC on the origination of the monies." (Id. at 54.)[13]

As mentioned, I have heard the tape and reviewed the transcript of the challenged conference call. I conclude the monitoring agent's decision to intercept the call on the basis of the crime-fraud exception to the attorney-client privilege was proper and consistent with the terms of the Minimization Letter. As noted by the agent, the purpose of the call appears to have been to reach mutual agreement on the origin of the $150,000.00 in the EPC account at the Reliance S & L, provided it could not be traced back to Zolp or Laser Arms. As the agent interpreted the conference call, "Berger is not giving advice, but he is engaged in a conversation where they are trying to work together to come up with something that will fly with the SEC." (Id. at 68–69.) Finally, the Government points out the call concluded with mutual assurances among some of the defendants to conceal the fact the call had been conducted. (Transcript of conference call at pp. 7–8). Such assurances bolster the agent's already reason-

12. The testimony of Berger, and the evidence of his prior representation of Baker and Castellano which he has submitted by cover letter, dated April 3, 1987, does not alter my determination that on May 12, 1986, the government had no knowledge, or any reasonable basis for having had knowledge, Berger represented Baker and Castellano. Nor does the point raised by counsel for Castellano, by letter dated April 9, 1987, that the government's criminal complaint in this matter, filed on September 10, 1986, identifies

Berger as an attorney for Baker and Castellano, affect this conclusion.

13. Although the agent testified at the hearing she could not recall what specific offenses are enumerated in 18 U.S.C. § 2516, she did testify that in May, 1986 she was aware of those offenses and was aware that obstruction of justice—the offense she believed the challenged conference call would violate—was such an offense. (Transcript, 3/31/87 at 56.)

able assumption that the conference call was in furtherance of criminal objectives.

Finally, defendants urge the taped conversation should be suppressed because the monitoring agent did not actually contact and obtain clearance from the office of the United States Attorney prior to intercepting the challenged interception. The agent testified that "[e]ither during the [preceding call between Formato and Castellano or during the conference] call, I contacted one of the two case agents or else I had a monitor do so. I can't recall whether one of the case agents was in the room at the time.... One reason was to have the case agent, one of them listen to the call as it was going on and also to contact the Assistant U.S. Attorney and advise her of the call." (Transcript, 3/31/87 at 54.) Apparently, this effort was made to comply with the Minimization Letter's warning that interceptions of calls involving attorneys suspected by the monitoring agent to be involved in criminal activity be cleared first by the United States Attorney's Office. Although the record does not establish the United States Attorney actually authorized interception of the conference call prior to its interception, the Minimization Letter's requirements were substantially adhered to such that the call need not be suppressed. The record indicates the initial call giving rise to the suspicion was commenced only three minutes prior to the subsequent call in which the allegedly unlawful conduct was discussed. Under such time constraints, I find the agent's determination to intercept the call was not unreasonable.

The Supreme Court has stated: "The [attorney-client] privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark*, 289 U.S. at 15, 53 S.Ct. at 469. *See also United States v. Ballard*, 779 F.2d 287, 292–93 (5th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *United States v. Harrelson*, 754 F.2d 1153, 1167 (5th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985) ("once the government has made a prima facie showing that the attorney was retained to promote intended or continuing criminal activity, the privilege may not be asserted"). Defendants have not come forward with evidence or arguments to overcome the Government's showing the subject conference call (1) involved parties not privy to the asserted privilege and (2) was conducted to initiate or further unlawful activity. Accordingly, the motions for suppression of the May 12, 1986 conference call are denied.

### G. Remaining Suppression Motions

Quinn and Livieratos have moved to suppress statements they made to Government officials on the ground the statements were elicited from the defendants in violation of their constitutional rights. Berger has also moved to suppress evidence seized from his briefcase at the time of his arrest.

### 1. Quinn's Statement

Quinn has moved to suppress from use at trial certain statements made by him to Government officials on the day of his arrest in September, 1986. At the evidentiary hearing, held on February 17, 1987, Quinn argued the statement he allegedly made had been elicited from him in violation of his Sixth Amendment right to counsel, as interpreted by the Supreme Court in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In a letter, dated March 20, 1987 and received in chambers on March 23, 1987, the Government has indicated it does not intend to use Quinn's statement at trial, except for potential impeachment purposes. Accordingly, Quinn's motion to suppress is rendered moot. My oral opinion, placed on the record on February 17, 1987, is hereby withdrawn.

### 2. Livieratos' Statements

Livieratos has moved to suppress from use at trial statements made during two meetings with Government officials, the first on December 3, 1986 and the second on January 27, 1986. The grounds for Livieratos' motion are two-fold: (1) he claims not to have understood the state-

ments he made during those two meetings could be used against him at trial, and thus his waivers of his Fifth Amendment right to counsel were not knowing and intelligent, and (2) he claims because the two questioning sessions were essentially initiated by the Government when the Government knew he was already represented by counsel, the statements he made were elicited by the Government in violation of his Sixth Amendment right to counsel. These challenges fall on both legal and factual grounds; thus, the motion to suppress is denied.

Most fundamentally, Livieratos' challenges to the admissibility of these statements fail because the evidence does not demonstrate his statements were the product of "custodial interrogation." The rights which Livieratos claims have been violated in this case derive from the landmark Supreme Court decisions, *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). In each of these cases, defendants were convicted in part because of the admission at trial of statements obtained during custodial governmental interrogations. In *Miranda,* the defendant was arrested at his home, taken to the police station and questioned for two hours in an interrogation room without having been advised of his right to counsel. In *Edwards,* the defendant was arrested, kept in jail overnight and questioned in jail the next morning without having been given an opportunity to speak with counsel. Similarly, in *Jackson,* the two defendants were questioned in jail while they were being held following their arraignments.

■ None of the evidence submitted in the case at bar suggests Livieratos' statements were the product of a custodial interrogation such as existed in the above-cited cases. At the evidentiary hearing on this matter, Livieratos testified with respect to both of the meetings that he arrived at the Government's office voluntarily, he knew and understood he could leave whenever he so chose, no Government officials forced him to stay and talk with them and, indeed, at the second meeting Livieratos in fact did leave voluntarily when he became angry at the Government's suggestion he might be facing an extensive prison sentence. (Transcript, 3/13/87 at 150–51, 153–56.) In the context of such a voluntary questioning session, the underlying concerns of the Fifth and Sixth Amendments' guarantees— the intimidating governmental presence and its attendant overwhelming pressure to talk—are simply not at stake.

Even if it could be said the interrogations at issue in this motion are custodial by nature, I find Livieratos knowingly, voluntarily and intelligently waived his rights under *Miranda* to have counsel present at the questioning sessions. Furthermore, I find Livieratos' Sixth Amendment right to counsel was not violated in this case because the Government did not reinitiate custodial interrogation as in the *Edwards* and *Jackson* cases interpreting this aspect of the right to counsel.

a. *Waiver of Miranda Rights*

■ In *Miranda,* the Supreme Court made plain that when a defendant is alleged to have waived his right to counsel, "a heavy burden rests on the Government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628. As amplified by the Supreme Court in *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1735, 1757–58, 60 L.Ed.2d 286 (1979), *quoting, Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938): "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" Because the evidence presented at the hearing amply demonstrates Livieratos knowingly, intelligently and voluntarily waived his right to the assistance of counsel at the two questioning sessions at issue, his motion to suppress on this ground must be denied.

The Government agent investigating this case testified that on each of the two occasions, prior to any questioning, Livieratos was advised of his *Miranda* rights, stated that he understood those rights and that he wanted to speak with the officials without a lawyer. (Transcript, 3/13/87 at 74–76, 78–79.) On each occasion, the agent testified, Livieratos read and signed a "Waiver of Rights" form in which he acknowledged he understood, and voluntarily waived, his right to counsel. (*Id.*) The agent further testified that on the first occasion, Livieratos stated he specifically did not want his attorney, or any other attorney, present. Livieratos testified at the hearing he signed the waiver cards on each occasion without reading them, he signed the cards only after he made his incriminating statements, he did not understand at the time he signed the cards that he had a right to have counsel present and at the time of the meetings he did not know his statements could be used against him. (*Id.* at 123–26, 131–35.) In light of the agent's testimony and other testimony elicited from Livieratos on cross-examination, I find Livieratos' claims are not credible.

Livieratos' testimony on cross-examination established he is an experienced businessman, versed in reading and reviewing corporate and financial documentation. (*Id.* at 141–42, 144.) His testimony further establishes Livieratos was aware of the charges against him at the time of the meetings and he knew he was speaking with the prosecutors in this case. (*Id.* at 143, 150.) The totality of these circumstances, in view of the unequivocal testimony of the Government agent, leads to the inescapable conclusion Livieratos knowingly, intelligently and voluntarily waived his right to have counsel present at these two sessions.

b. *Sixth Amendment Right to Counsel*

The second prong of Livieratos' attack on the admissibility of his statements at trial is that the statements were the product of Government initiated custodial interrogation at a time when the Government was aware Livieratos was represented by counsel. Livieratos argues his statements were thus elicited in violation of his Sixth Amendment right to counsel as interpreted by the Supreme Court in the *Edwards* and *Jackson* cases. Because the facts established at the hearing indicate these two meetings were not initiated by the Government as was the questioning in *Edwards* and *Jackson*, and because the facts of this case are so far removed from those obtaining in those cases, the motion to suppress the statements on this ground must also be denied.

Livieratos testified at the hearing that he initiated the first meeting with the Government in December, 1986, by calling the office of the United States Attorney in Newark, New Jersey. (Transcript, 3/13/87 at 121.) His testimony indicated the impetus for his making the telephone call came from a man named Sevitis, a prominent member of the Greek community in Elizabeth, New Jersey. (*Id.* at 117–21.) Sevitis was apparently concerned for Livieratos, wanted him to clear up his troubles stemming from the Laser Arms indictment and had been in contact with a Government agent named Ron in New York who suggested to Sevitis that Livieratos call Government officials in Newark. Such a scenario simply does not amount to governmental initiation of custodial interrogation such as was conducted in the *Edwards* and *Jackson* cases.

In *Edwards*, the defendant initially waived his right to counsel and made a statement to the police. During the course of questioning he indicated he wanted to make a deal with the police but he wanted first to speak with an attorney. The questioning ceased and the defendant was kept overnight in jail. The following morning, before the defendant had spoken with an attorney, detectives reinitiated questioning by asking him if he would like to talk with them. Because the defendant had not initiated this second questioning session, the Supreme Court found he had not validly withdrawn his prior request for counsel and held his subsequent statements should have been suppressed at trial.

Similarly, in *Jackson*, the two defendants challenging the admissibility of their state-

ments had requested counsel at their respective arraignments. Within a matter of days, during which time the defendants were held in custody, and before they had had an opportunity to speak with counsel, Government officials requested and obtained statements from the defendants. Despite the fact defendants had been readvised of their *Miranda* rights and had indicated a willingness to talk, the Supreme Court found such reinitiation of questioning by the Government to be impermissible.

■ The case at bar presents facts fundamentally different from those presented in *Edwards* and *Jackson.* In this case it is apparent the defendant initiated the direct contact with the Government which in turn led to the meetings at which statements were made. The suggestion by Livieratos that the Government reinitiated any previously foreclosed questioning is not borne out by the record. Furthermore, the suggestion that the Government may have instigated events which led Livieratos to contact officials in Newark, via the "middleman" Sevitis, is too attenuated to raise the concerns underlying the *Edwards* and *Jackson* cases. The facts of this case do not suggest impermissible Government initiation and custodial interrogations. Thus, the motion to suppress is, in all respects, denied.

### 3. *Evidence from Berger's Briefcase*

Berger has moved to suppress from use at trial all evidence seized by the Government from his briefcase at the time of his arrest. Berger asserts the Government's warrantless seizure of evidence from his briefcase was violative of the Fourth, Fifth and Sixth Amendments and any evidence so seized must be suppressed. The Government argues the evidence in question was properly obtained because Berger consented to the search which produced the evidence and because the evidence was the product of a valid inventory search as well as a valid search incident to arrest. Because I find Berger voluntarily consented

to the search which led to the evidence in question, the motion to suppress is denied.

At an evidentiary hearing conducted on March 25, 1987, several Government agents testified to establish the following facts.[14] In the morning of September 9, 1986, Berger called the F.B.I. office in Newark, New Jersey and was informed certain of his clients were under arrest in connection with the investigation into Laser Arms. Berger agreed to meet with F.B.I. authorities in Newark and arrived at the office in mid-morning. Immediately upon his arrival, Berger was led to an interview room and placed under arrest. He was frisked, advised of his *Miranda* rights and asked whether he wished to waive his rights. He declined to waive those rights.

Berger brought a briefcase to the F.B.I. office which he placed on a table in the interview room at the time of his arrest. The supervising agent asked Berger (the testimony is unclear whether Berger had already been advised of his *Miranda* rights) whether the briefcase contained any "defense strategy" pertaining to clients connected to the Laser Arms case. Berger indicated it did not, but that it contained some material pertaining to unrelated matters. The agent then asked for Berger's permission to open the briefcase. According to the agent: "Mr. Berger's response was, go ahead. [Question:] Kind of shrugged his shoulders? [Answer:] Yes.... He nonchalantly said, go ahead." (Transcript, 3/25/87 at 44.) According to another agent present at the arrest, Berger then "checked the front of [the briefcase] to make sure it was in an unlocked position before [the supervising agent] opened it." (*Id.* at 89.) Berger made no objection as the supervising agent checked the briefcase to make sure it contained no weapons and gave it to another agent. Berger was subsequently arraigned, at which time two folders from the briefcase pertaining to unrelated matters were returned to him. At some point subsequent, the Government

**14.** Berger knowingly and voluntarily waived his right to testify at this hearing. (Transcript, 3/25/87 at 103–04.)

gave to Berger photocopies of the other contents of the briefcase—apparently two "lawyer's diaries." The Government has retained the originals as potential evidence in the case.

The law is clear that evidence secured by the Government during a warrantless search is admissible at trial provided the individual subjected to the search voluntarily consented to it. In *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), the Supreme Court held that

> the question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent.

In subsequent cases, courts have consistently held voluntary consent to a government request for permission to conduct a search may be given, even by an arrested individual not apprised of his *Miranda* rights. *See, e.g., United States v. Watson*, 423 U.S. 411, 424–25, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); *Cody v. Solem*, 755 F.2d 1323, 1328–30 (8th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 104, 88 L.Ed.2d 84 (1985); *United States v. Ritter*, 752 F.2d 435, 438–39 (9th Cir.1985); *United States v. Hall*, 565 F.2d 917, 920–21 (5th Cir.1978).

■ Under the totality of the circumstances in this case, I find Berger voluntarily consented to the Government's search of his briefcase. As an initial matter, Berger is an attorney who, at the time the consent was sought and obtained, purported to represent clients arrested in a criminal matter. It is not unreasonable to assume a criminal defense attorney understands and is aware of the consequences of a consent to an F.B.I. agent's request for permission to search his briefcase. Furthermore, the evidence shows Berger freely consented to the search, assisted the F.B.I. agent in making certain the briefcase was unlocked and made no objection while the briefcase was searched and retained by Government agents. The record contains nothing to indicate Berger's consent to the search was the result of coercion or other impermissible conduct on the part of the Government agents. Given such circumstances, I can only find the consent was voluntarily given.

Drawing favorable inferences from the record, Berger argues the court should presume the supervising agent's request for permission to search the briefcase was made after Berger had been advised of his *Miranda* rights and had refused to waive them. Under the doctrine of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), Berger asserts the agent should not have asked permission to search the briefcase. Because the question should not have been asked, Berger claims his response to the question (the consent) was invalid. As discussed, *supra*, the *Edwards* line of cases addresses situations involving governmental *interrogations* in which the Government seeks to elicit *testimonial* evidence from criminal suspects. Those cases address Fifth and Sixth Amendment concerns over an individual's right against compelled self-incrimination and right to counsel. The *Edwards* line of cases do not address the Fourth Amendment concern with warrantless searches and seizures of *real* evidence.

Numerous courts have recognized the importance of this distinction between the concerns addressed by the different amendments. In *Cody v. Solem*, the Eighth Circuit stated that an individual's "consent, in and of itself, is not evidence which tends to incriminate him. While the search taken pursuant to that consent disclosed incriminating evidence, this evidence is real and physical, not testimonial.... Any violation of [the individual's] fifth amendment rights with regard to the suppressed incriminating statements is thus only relevant to the voluntariness of the consent in view of the totality of the circumstances." *Cody*, 755 F.2d at 1332. *See also, Hall*, 565 F.2d at 921 ("We declined to import into fourth amendment analysis the safeguards against self-incrimination enunciated in *Miranda* to strengthen the fifth amendment's function in preserving the integrity of criminal trials."); *United States v. Lemon*, 550

F.2d 467, 472 n. 5 (9th Cir.1977) ("There is no fourth amendment prophylactic rule comparable to that of *Miranda* in the fifth amendment context.").

Berger's reliance on *United States ex rel. Daley v. Yeager*, 415 F.2d 779 (3d Cir.1969), *cert. denied*, 397 U.S. 924, 90 S.Ct. 919, 25 L.Ed.2d 104 (1970) and *United States v. Abbott*, 546 F.2d 883 (10th Cir. 1977), is unavailing. In *Yeager*, immediately after a preliminary hearing at which the accused requested an attorney, the police obtained consent to search the accused's apartment. Without explicitly explaining its reasoning, the Third Circuit held the accused's "rights under the Fourth, Fifth and Eighth Amendments were denied." *Yeager*, 415 F.2d at 783. However, the facts of the case amply demonstrate that for purposes of a Fourth Amendment consent to search analysis, the accused's consent was not voluntary. Specifically, the record indicated the accused possessed the mental capacity of an eleven or twelve year old, had had very little sleep in the forty hours preceding the consent and had been diagnosed as schizophrenic, with little tolerance in stressful situations and subject to suggestibility. Given the totality of those circumstances, a determination that the consent obtained was involuntary is entirely reasonable. In *Abbott*, the Tenth Circuit held under the specific circumstances of that case, an individual's consent to a police request to search the interior of the individual's car could not be presumed to extend to a subsequent search of the trunk of the car. The facts peculiar to that case simply have no bearing on the totality of the circumstances in the case at bar.

Because I find Berger voluntarily consented to the search of his briefcase, the motion to suppress evidence seized from the briefcase is denied.

### H. *Remaining Motions*

#### 1. *Berger's Cross-Examination of Formato*

Counsel for Berger has anticipated a co-defendant, Lorenzo Formato, will testify at trial on behalf of the Government and against Berger. Berger was, at some point prior to his and Formato's arrest in connection with this case, Formato's attorney. Berger has filed a motion *in limine* seeking permission to cross-examine Formato with respect to matters of which Berger has knowledge by virtue of his prior attorney-client relationship with Formato. Berger asserts Formato, by taking the witness stand for the Government and against Berger, will waive his privilege over *all* communications he has had with Berger, whether or not those communications are related to any aspect of Formato's cooperation with the Government. The Government concedes Formato waives his privilege with respect to the subject matter of any attorney-client communications Formato has discussed with the Government or will disclose at trial. However, the Government disputes the privilege over all attorney-client communications is waived simply because Formato testifies for the Government.[15]

 Although caselaw discussing this issue is scarce, I am persuaded a Government witness waives the confidentiality of those attorney-client communications the subject matter of which the witness discusses with the Government or discloses at trial. Consequently, such matters may properly be the subject of cross-examination at trial. However, I do not accept the suggestion a Government witness waives the privilege over attorney-client communications unrelated to discussions he has had with the Government or discloses at trial. Even in the unique circumstances of this case, in which the attorney to whom the communications were made is a defendant against whom the witness may testify, the witness does not waive the privilege simply because he takes the stand.

Because Berger is a New York attorney, it is appropriate to assess his proposed cross-examination of Formato in light of

**15.** The Government has represented that Formato and his attorney are in accord with the Government's position.

New York's ethics rules. Ethical Consideration 4–5 of Canon 4 of New York's Code of Professional Responsibility provides: "A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client and a lawyer should not use, except with the consent of his client after full disclosure, such information for his own purposes." Disciplinary Rule 4–101(B) provides, in relevant part: "Except where permitted under DR 4–101(C), a lawyer shall not knowingly: (1) Reveal a confidence or secret of his client.... (3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure." (Footnotes omitted).[16] Because I am advised Formato has not consented to the proposed nature of Berger's cross-examination, the court must begin with the presumption Formato will not waive the privilege simply by taking the witness stand for the Government.

Berger has cited to two cases, *United States ex rel. Kachinski v. Cavell*, 453 F.2d 581 (3d Cir.1971), and *United States v. Rispo*, 460 F.2d 965 (3d Cir.1972), to support his argument on this motion. Those cases, however, do not carry Berger's point to the lengths he asserts. In *Cavell*, the Third Circuit merely noted a Government witness waived the confidentiality of attorney communications only to the extent he discusses such confidential communications with the Government: "[The witness] waived any attorney-client privilege by making a statement to the police about what he knew of the crimes for which [the defendant] was convicted, so that there was nothing to prevent the attorney from questioning [the witness] on behalf of [the defendant]." *Cavell*, 453 F.2d at 583 n. 6. In *Rispo*, the Third Circuit found a defense attorney who had represented another co-defendant at the outset of the case should have disqualified himself from continuing to represent his remaining two clients in

the case. The court ruled the attorney's cross-examination of his prior client might have been less than vigorous because of the fact of his prior representation. Although the Third Circuit did not vacate the convictions on this ground, it found the potential conflict raised a "serious" question about effective assistance of counsel. Although *Cavell* and *Rispo* are informative, they provide little guidance in the case at bar and do not support Berger's blanket assertion that Formato's confidential discussions with him are fair game for cross-examination.

In *United States v. James*, 708 F.2d 40 (2d Cir.1983), the Second Circuit discussed the ramifications of the attorney-client privilege in the context of a Government witness' testimony at a criminal trial. In *James*, the Government sought to disqualify defense counsel after counsel indicated they intended to call a Government witness as a defense witness to establish an entrapment defense. The basis for the Government's motion was that the defense counsel had previously represented the witness in prior criminal matters. The Government asserted the danger of defense counsel utilizing information previously obtained solely by virtue of counsel's relationship with the witness mandated that counsel be disqualified from continuing to represent the defendants in the case. The district court agreed and granted the motion to disqualify and the Second Circuit affirmed.

Although the case is not identical to the case at bar, it is sufficiently analogous that aspects of the Second Circuit's decision and reasoning are applicable here. One implicit element of the Second Circuit's ruling was that a witness does not waive his privilege over all confidential communications solely by virtue of his cooperation with the Government: "Defendants also contend here, as they did below, that [the witness'] apparent disclosures to the government

---

16. One of the exceptions referred to in the Rule permits an attorney to disclose "[c]onfidences or secrets necessary to establish or collect his fee or to defend himself or his employees or associates against an accusation of wrongful conduct." (DR 4–101(C)(4) (footnotes omitted).) The notes to the Rule suggest, however, that this exception is intended to address situations in which attorneys are charged with negligence or misconduct in actions brought by their clients. Moreover, as discussed, *infra*, the confidential communications Berger seeks to disclose during his cross-examination of Formato, are not "necessary" to his defense in this case.

waived his attorney-client privilege. There is no basis in the record for a finding of waiver.... The fact that [the witness] is cooperating with the government does not suggest that he has disclosed his privileged communications." *Id.* at 44 n. 3.

A second aspect of the decision having some bearing on this case was the Second Circuit's recognition that to promote the "fundamental fairness" of the judicial system, attorneys should not be permitted to take advantage of privileged communications to the detriment of former clients:

[W]e are inclined to agree with the district court's assessment that the interests of the government, the witness and the public weigh [against disclosure of confidential communications].

\* \* \* \* \* \*

"[D]isqualification motions should be granted where the attorney in question is potentially in a position to use privileged information obtained during prior representation of the movant.... Disqualification of counsel in such cases is rooted in notions of fundamental fairness; allowing an attorney to represent a client in a situation where he may use information obtained in the course of former representation of the client's adversary gives the client an 'unfair advantage.'"

*Id.* at 45, *quoting United States v. Cunningham,* 672 F.2d 1064, 1072 (2d Cir.1982) (quoting *United States v. Ostrer,* 597 F.2d 337, 339–40 (2d Cir.1979)). In the case at bar Berger, although in the shoes of a defendant, seeks to make use of matters known to him solely by virtue of his prior relationship with Formato. This is not a route, the Second Circuit suggests, that should be lightly permitted.

Finally, the Second Circuit found the interests to be promoted in protecting confidential communications are strong enough to overcome a defendant's asserted constitutional right to counsel of his choice: "[E]ven the constitutional dimension of a criminal defendant's right to counsel of his choice does not give the defendant the right to take advantage of his preferred

attorney's confidential knowledge gained from prior representation of the witness." *Id.* at 46. Thus, the Second Circuit explicitly found the Sixth Amendment's guarantee of counsel bows, in appropriate contexts, to the interests protected by the attorney-client privilege.

Berger urges that because he is actually a defendant in this case, his position is different from the position of attorneys in disqualification motions. Although the facts of Berger's situation may be unique, he has not demonstrated that cross-examination of Formato on non-disclosed confidential communications is necessary to afford him effective cross-examination. The Sixth Amendment affords Berger the right to "effectively" cross-examine Formato. *See Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965); *United States ex rel. Blackwell v. Franzen,* 688 F.2d 496, 499–500 (7th Cir. 1982), *cert. denied,* 460 U.S. 1072, 103 S.Ct. 1529, 75 L.Ed.2d 950 (1983). Berger should have ample opportunity to effectively cross-examine Formato, either with material not subject to the privilege or with matters over which, because of his discussions with the Government or his disclosures at trial, Formato will have waived the privilege. Berger will be able to cross-examine Formato effectively without going into areas protected by the attorney-client privilege. Accordingly, Berger's motion that Formato will have waived the privilege in all respects for purposes of cross-examination, or, alternatively, to bar Formato's direct testimony, is denied.

During a telephone conference call held on April 2, 1987, I discussed with counsel for Berger and the Government possible alternative mechanisms for protecting Formato's privileged communications while still affording Berger's counsel an opportunity to effectively prepare for trial. As a result of that conference, counsel for Berger and the Government have agreed to submit an order embodying the following procedure.[17] Berger and the Government will each designate independent counsel uninvolved in this case. The Government

---

**17.** A copy of the order is attached to this opinion as Exhibit A.

will advise its counsel as to any communications Formato has had with the Government as to which an attorney-client privilege between Formato and Berger may attach, and Berger will advise his independent counsel as to any confidential communications with which he would like to cross-examine Formato. I shall meet with the independent counsel *in camera* to determine what areas of inquiry will be available to Berger on cross-examination. This session will remain confidential and shall not be disclosed to the respective trial attorneys. This procedure should serve to protect Formato's truly privileged communications while assuring Berger's counsel of adequate opportunity to prepare for effective cross-examination of Formato. Moreover, it will protect from disclosure the parties' respective trial strategies.

### 2. *Duplicitousness of Count Six*

██ Count six of the indictment charges five of the defendants with a violation of the federal wire fraud statute in connection with their efforts to obtain $150,000.00 from the EPC account at the Reliance S & L in Rahway, New Jersey. The statute in question provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1343. Certain of the defendants named in count six suggest the count is duplicitous in that it charges at least two distinct crimes. Because count six incorporates a large portion of count five of the indictment—count five alleging the conspiracy to obstruct justice—defendants suggest count six implicitly charges wire fraud in connection with the obstruction of justice allegations. Defendants point out count six also explicitly charges defendants with

wire fraud in connection with a scheme to defraud Laser Arms investors. This duplicitous count of the indictment, defendants assert, must be stricken.

"Duplicity consists of charging *in the same count* of an indictment two or more separate offenses." 8 J. Moore, *Moore's Federal Practice*, ¶ 8.03[1] (2d ed. 1986) (emphasis in original). The prohibition against duplicitous counts protects defendants and enhances the criminal justice system in several respects. The prohibition protects defendants against double jeopardy and ambiguous jury verdicts which could prejudice a defendant at sentencing or on appellate review. The prohibition also protects defendants on evidentiary rulings during trial on proferred evidence which might be admissible for purposes of proving one of the offenses charged in the count but not the other. Furthermore, the prohibition ensures jury verdicts are unanimous with respect to the distinct crimes charged. *See United States v. Starks*, 515 F.2d 112, 116–17 (3d Cir.1975), *aff'd in part, rev'd in part sub nom, Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). *See also*, 8 J. Moore, *Moore's Federal Practice*, ¶ 8.03[1] (2d ed. 1986).

Because count six of this indictment charges the defendants named therein with only one scheme or artifice to defraud, namely the fraudulent effort to obtain the $150,000.00 from the EPC account at the Reliance S & L, the count is not duplicitous. The wire fraud statute prohibits use of the wires to execute "any scheme or artifice to defraud." These defendants are charged with use of the wires to execute a single scheme to obtain the $150,000.00 from the EPC account. The fact that the single scheme may have more than one victim— i.e., the SEC civil proceeding and Laser Arms investors—does not alter the fact only one scheme is charged. See *United States v. Morse*, 785 F.2d 771, 774 (9th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 2925, 91 L.Ed.2d 553 (1986); *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981). Accordingly, the count is not duplicitous and defendants' motion is denied.

### 3. *Surplusage in Count Five*

Count five of the indictment charges six of the defendants with engaging in a conspiracy to obstruct justice. The count charges the defendants with conspiring to evade a court order freezing all assets of Zolp and Laser Arms. That court order stemmed from the SEC civil investigation into the affairs of Laser Arms and was entered on or about April 30, 1986. Count five charges the conspiracy to evade the court's freeze order began on or about April 30, 1986, when the freeze order was entered. The original indictment also charged, as one of the overt acts in furtherance of the conspiracy, "[o]n or about April 15, 1986, defendant Morton Berger falsely told an SEC investigator that defendant Berger had been retained by 'Robert Frosse,' as an officer and director of Laser Arms." On April 9, 1987, the Government filed a superseding indictment. In relevant part, the superseding indictment deletes the above-cited overt act and in its place asserts: "On or about May 2, 1986, defendant Morton Berger sent a letter to the SEC confirming a conversation in which he has stated that he had been retained to represent Laser Arms by an individual named 'Robert Frosse.'" (Superseding Indictment at 19.) In light of this amendment, Berger's surplusage motion is rendered moot.

### 4. *Preservation of New Jersey Bell Telephone Records*

In papers filed on behalf of Baker in early January, 1987, counsel requested "an order requiring New Jersey Bell Telephone to preserve all relevant information and materials sought pending further Order of the Court." Counsel did not brief or argue the point and thus has provided the court with no factual or legal basis or authority for issuing such an order. Because I can discern no basis for issuing the order requested, the motion is denied.

### *Conclusion*

The Government is directed to submit an order consistent with the terms of this opinion.

### EXHIBIT "A"

THIS MATTER having come before the Court upon the motion of defendant Morton Berger (Alvin Entin, Esq., appearing) for an Order declaring that there is an automatic waiver of any and all attorney-client privilege possessed by Lorenzo Formato if Mr. Formato takes the witness stand as a prosecution witness in the above-referenced case, and Samuel A. Alito, Jr., United States Attorney for the District of New Jersey (Faith S. Hochberg, Assistant U.S. Attorney, appearing) having been heard, and the Court having considered the written submissions of both parties, oral argument on March 25, 1987, continued oral argument during a conference call on April 2, 1987, held without stenographic transcription by consent of all parties and supplemental legal memoranda, and for good cause shown,

IT IS on this day of April, 1987 ORDERED that:

1. Defendant Morton Berger shall, through an attorney designated by Alvin Entin, Esq. (the "defendant's representative"), provide a proffer to this Court, *in camera,* of each and every privileged conversation that Mr. Berger wishes to disclose during his cross-examination of Mr. Formato;

2. Defendant Berger's proffer shall be provided to a representative of the United States Attorney's Office (the "government representative"), designated by Faith S. Hochberg, Assistant U.S. Attorney;

3. The government representative will compare the proffer of defendant Morton Berger with the disclosure, if any, made by defendant Lorenzo Formato to the Federal Bureau of Investigation ("FBI") to determine which privileged communications, if any, have been waived by Formato's disclosure of such communications to an agent of the FBI. A copy of Lorenzo Formato's statements to the FBI will also be provided to this Court and to the defendant's representative.

4. The government representative will also consult with Lorenzo Formato's attorney and inform this Court as to whether

Lorenzo Formato wishes to assert his attorney-client privilege with respect to any communications to Morton Berger that have not been waived provided, however, that the government representative shall not make known to Lorenzo Formato the contents of Morton Berger's proffer;

5. This Court will then hear argument, in camera, and rule upon which proffered communications have been waived by Mr. Formato's disclosure of them and which proffered communications may not be revealed by Mr. Berger upon cross-examination because Mr. Formato retains the right to assert an attorney-client privilege as to those items. Upon an analysis of the law adduced by both sides, this Court rules that there is no automatic waiver by law of any and all privileged communications simply by virtue of Mr. Formato's possible testimony as a prosecution witness;

6. This Court will rule solely upon whether the proffered communications retain their status as privileged communications; this ruling will not foreclose either side from asserting at trial that an area of proposed direct or cross-examination should be barred for other grounds encompassed within the Federal Rules of Evidence (e.g., F.R.Evid. 608, 609 403, etc.).

7. Neither the government representative nor the defendant's representative shall disclose the contents of defendant Berger's proffer and of Lorenzo Formato's statements to the FBI, except as specifically provided herein:

(a) The defendant's representative shall disclose to Mr. Entin neither the contents of Mr. Berger's proffer nor the contents of Mr. Formato's disclosures to the FBI, except that Mr. Entin may be provided with a list of the proffered communications that this court rules are permissible for him to use during the cross-examination of Mr. Formato;

(b) the government representative shall not disclose the contents of Mr. Berger's proffer, to the Assistant U.S. Attorneys responsible for trial of the above-referenced case, except that they may be given a list of those categories of proffered cross-examination that this Court rules are impermissible for use during cross-examination without revealing the specific privileged communications themselves;

(c) On the same date that the government turns over to Alvin Entin, Esq. the Jencks materials pertaining to Mr. Formato, including his statements to the FBI, the government representative will then be permitted to disclose to the government trial attorneys the list of proffered communications provided by defendant Berger approved by the Court so that the government's trial attorneys possess the necessary information to object at trial if defendant Berger seeks to disclose any attorney-client communications that have not been previously approved by this Court for this advance ruling; provided, however, that the prosecutors and/or their agents shall not use their knowledge derived directly from this proffer to prepare Lorenzo Formato for his cross-examination.

8. Defendant Berger's proffer shall be delivered to this court and to the government representative no later than May 6, 1987; the response by the government representative shall be delivered to this Court and to the defendant's representative no later than May 8, 1987; this Court will hold an *in camera* hearing with respect to this matter on May 18, 1987.

9. In recognition of the complex nature of this case and the difficult points of law to be decided, the time period between the filing of defendant Berger's motion *in limine* and this Court's ruling thereon is excluded from the computation of time pursuant to the Speedy Trial Act, 18 U.S.C. § 3161(h)(1)(F).